UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**TRAVIS WICKS,**<br><br>　　　　　**Defendant.** | Case No. 23-cr-000167 |

### GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION

　　The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in support of its motion that Defendant Travis Wicks be detained pending trial pursuant to 18 U.S.C. § 3142(f)(1)(E) (felony involving a firearm) and 18 U.S.C. § 3142(f)(2)(B) (threatening a prospective witness) of the federal bail statute. Defendant Wicks is charged with the possession of a handgun, rifle converter, and extended ammunition magazines, allowing him to shoot the dozens of rounds he possessed with significantly greater speed and accuracy. He is charged with possessing this frightening weapon even though he is on supervision for Voluntary Manslaughter While Armed. Defendant Wicks has killed at least two people and shot a third. This represents his fourth gun charge, and he has a history of using guns to threaten, harm, and even kill. Considering the factors specified under 18 U.S.C. § 3142(g), there are no conditions or combination of conditions short of detention that can ensure the safety of our community.

　　For the following reasons, the Court should order Defendant Wicks detained pending trial.

## BACKGROUND

On May 11, 2023, Defendant Wicks was charged by indictment with a single count of Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 U.S.C. § 922(g)(1). An initial appearance was held before the Honorable Judge Robin M. Meriweather on May 23, 2023. At that hearing, the Government indicated that it would seek Mr. Wicks' detention pending trial.

### *The Instant Offense*

The investigation into the instant offense arose out of a December 23, 2021 homicide investigation. On December 23, 2021, in the 4200 block of 4th Street SE, Marcus Thomas, Russell Williams, and T.M. were shot multiple times by two assailants using an assault-rifle-style weapon. Thomas and Williams did not survive. Witnesses reported that the night before the shooting, Williams and Defendant Wicks had engaged in an argument. Surveillance video from the morning of the shooting reflected that Defendant Wicks approached and spoke to the two shooters approximately two and-a-half hours prior to the shooting in the same area of the shooting. Detectives with the Metropolitan Police Department (MPD) have been investigating this shooting since it occurred. On December 28, 2021, Defendant Wicks was interviewed about the shooting. While he acknowledged being in the area and having an argument with someone the night before, he denied any involvement and denied knowing Russell Williams.

Defendant Wicks had been dating Russell Williams' sister, Witness 1, for the past three years. MPD sought to interview Witness 1 in relation to the murder of her brother at multiple times since the murder. In April 2023, MPD detectives were finally able to arrange a meeting with Witness 1. On April 20, 2023, Witness 1 was interviewed regarding the murder of her brother. She stated that she had heard indirectly that Defendant Wicks may have been involved and that Wicks had argued with her brother the night before, but she had no direct knowledge of Wicks' involvement. During the interview, however, Witness 1 indicated that she was afraid that Wicks would harm her or her family, and that Wicks was in possession of a handgun, rifle converter, extended magazines, and laser sight.

Witness 1 reported that in October 2022, she had moved with her seven-year-old child to an apartment on 6th Street SE, in Washington D.C. (hereinafter "Witness 1's Apartment").[1] After she moved, Wicks became notably volatile towards her, and would frequently initiate verbal disputes over minor issues. Witness 1 noted that she had not given Wicks a key to the apartment. Instead, Witness 1 came to the apartment walkthrough with her and took the extra key. He then moved into the apartment without Witness 1's consent where remained for several months.

---

[1] Wicks is not the child's father.

Witness 1 reported that on April 17, 2023, at approximately 8:00 PM, Wicks was sitting on the couch in the living room, while Witness 1 was preparing to leave to do laundry. Wicks began yelling at Witness 1: "Bitch I will kill you."  Wicks' phone then rang and he yelled, "You lucky the phone rang, whoever this was saved you."  Witness 1 reported that at the time of this incident, Wicks had a firearm under the pillow on his side of the bed. She described the firearm as a black/gold in color firearm which appeared to have a drum magazine attached to the magazine well with an additional clip located in the front of the weapon. The weapon also had an attached laser. Witness 1 reported that Wicks would on occasion display this weapon and point the weapon at Witness 1 while they were engaged in verbal disputes.

Witness 1 reported that on another occasion, on Sunday, March 12, 2023, at approximately 11:00 PM, Witness 1 and Wicks began arguing over how Witness 1 wanted to celebrate her birthday. At the time of the argument, Wicks was holding the same firearm as Witness 1 had referenced in the April 17, 2023 incident. Wicks proceeded to load a clip in the weapon and state: "You are going to make me act out."

Witness 1 reported that on another occasion, on Valentine's Day, February 14th, 2023, Wicks gave Witness 1 a stuffed animal (specifically a teddy bear). Approximately one month later, around the date of Witness 1's birthday, when she came home after celebrating, she found the teddy bear on her bed with a knife lodged in its head.

Witness 1 stated that she had never previously reported these incidents to police because she was afraid that Wicks would retaliate against her or her child. Witness 1 reported that Wicks had previously threatened to shoot her family members if she ever reported him to law enforcement.

On Thursday, April 20, 2023, Witness 1 contacted MPD Detective Stallings and reported that Wicks was in possession of a gun, which he had placed on the couch inside her apartment. Witness 1 took a photograph of the firearm and sent it to Stallings.

*Figure 1 – Photograph of Firearm Taken by Witness 1*



During her interview with Detective Stallings, Witness 1 repeatedly expressed concern for her safety. She stated that she was afraid to relocate or leave because Wicks would find and kill her. During the interview, Witness 1 also identified a photograph of Wicks, and confirmed that he had threatened to kill her.

Based on this interview and the corroborating photograph, Detective Stallings applied for and was granted a warrant to search Witness 1's Apartment (D.C. Superior Court Search Warrant 2023 CSWLD 001475).   On May 1, 2023, at 6:04 AM, MPD executed the warrant.

Inside the apartment officers found Wicks, Witness 1, and Witness 1's minor child. During the search, officers observed a single 9mm round in a kitchen cabinet. In the living room, on a lower tier of the coffee table was a black laser sight for a firearm, as circled below in Figure 2, a photograph from the search.

*Figure 2 – Black Laser Sight*



In the closet of the rear bedroom on the floor were nine loose rounds of 9mm ammunition next to an ammunition magazine drum which contained forty rounds of 9mm, as shown below in Figure 3, a photograph from the search.

*Figure 3 - Recovered Ammunition and Magazine Drum*



Next to the drum was a Sig Sauer P-365 semi-automatic handgun with the serial number obliterated. The handgun had been inserted into a rifle converter which allows an individual to hold the pistol like a rifle with a stock, as shown below in Figure 4, a photograph from the search.

*Figure 4 - Firearm with Rifle Converter*



Notably, the recovered firearm, magazine and accessories appear to be identical to the firearm, magazine and accessories previously photographed by Witness 1. No firearms or ammunition are manufactured within the District of Columbia and therefore these items traveled in interstate commerce.

The rear bedroom closet in which the firearm was found had multiple pairs of men's sized shoes and female apparel. Witness 1 identified the rear bedroom as the room she shared with Wicks. She also stated that Wicks kept his clothes in that closet and the pair of pants under the firearm belonged to Wicks. Additionally, Witness 1 reported that Wicks was in possession of the firearm in the moments before police officers arrived to execute the search warrant. When officers knocked to execute the warrant, Witness 1 reported that Wicks had placed the firearm in the rear closet of the bedroom and tried to unload the magazine.

At the time of these offenses, Wicks had previously been convicted of a crime punishable by imprisonment for a term exceeding one year. Specifically, on October 28, 2005, Wicks was sentenced to 200 months' confinement and five years' supervised release for the charge of Voluntary Manslaughter while Armed in D.C. Superior Court Case No. 2004 FEL 004000. Additionally, on June 19, 1997, Wicks was sentenced to twenty to sixty months' incarceration for Carrying a Pistol Without a License in D.C. Superior Court Case No. 1995 FEL 000974. On May 1, 2023, Wicks was arrested and charged in D.C. Superior Court Case No. 2023 CF2 002701 with Unlawful Possession of a Firearm (Prior Conviction) and Unlawful Possession of Ammunition. That case has since been dismissed in light of the Government proceeding on this matter in District Court.

Since Wicks' arrest, Witness 1 has been relocated for her safety. Nonetheless, she has reported that Wicks sent men to her mother's home. Witness 1 continues to fear for her safety as well as the safety of her family and child.

***Defendant Wicks' Criminal History***

On August 25, 1993, Wicks was arrested and charged with Assault with a Dangerous Weapon based on his possession of a sawed-off shotgun. The victim in that case reported that Wicks and he had engaged in an argument, and then Wicks threatened him with a long-barrel gun, before running into a house. Officers searched the house and found a 12-gauge shotgun with a sawed-off stock and barrel. In connection with this arrest, Wicks later pled guilty to Possession of a Prohibited Weapon in D.C. Superior Court Case 1993 FEL 008977. While he was initially sentenced to a probationary sentence under the Youth Rehabilitation Act, that sentence was revoked to one year incarceration.

On January 12, 1995, Wicks and a man named Todd Stradford had an argument about a basketball. Wicks demanded the ball, but Stradford refused and gave it to someone else. Stradford left the basketball court but stated "I'll be back."  Stradford returned and stood near the court with his hands behind his back. Wicks then took a handgun from a friend, walked up to Stradford, and began shooting at him as Stradford ran away. He shot Stradford in the chest, back, and once in the left hand, as Stradford apparently tried to block the bullet. Stradford died. Stradford never was seen with a weapon, and no weapons were found on or near his person. Wicks was charged with First-Degree Murder While Armed, Possession of a Firearm During a Crime of Violence, and Carrying a Pistol Without a License in D.C. Superior Court Case 1995 FEL 000974. At trial, Wicks testified in his own defense, and claimed self-defense. The jury acquitted Wicks of First-Degree Murder While Armed and Possession of a Firearm During a Crime of Violence but convicted him of the firearm charge. Wicks was sentenced to a term of incarceration of twenty to sixty months.

On April 29, 2000, a complaining witness reported that Defendant Wicks and another man jumped him as he was walking home. During the assault, Wicks and the other man kicked and stomped on the complaining witness in his face and midsection. Both Wicks and his accomplice were wearing boots. The complaining witness was treated in the hospital for a broken nose, bruises, and swelling. Wicks was indicted on charges of Assault with a Dangerous Weapon (shod foot) but pled guilty to Simple Assault in D.C. Superior Court Case 2000 FEL 005305. On March 13, 2001, Wicks was sentenced to 180 days' incarceration.

On March 28, 2003, a woman reported that her then boyfriend, Defendant Wicks, became violent during an argument with her. According to the woman, Wicks grabbed her by the neck and began choking her, lifting her off the ground as he did so. She recalled falling unconscious. When she came to, Wicks told her: "You're not going to be satisfied until I take my gun and beat you with the back of it." Wicks told her that he meant business and he would show her. This case, D.C. Superior Court Case 2003 FEL 002230, was dismissed when the woman failed to appear for trial.

On June 24, 2004, Wicks was arrested for repeatedly stabbing a man to death. That night, Wicks was at a Denny's restaurant, seated with friends, armed with two large pocketknives. Wicks' table and another table got into an argument. After some shoving, Wicks introduced a knife to the fight and stabbed a man named Leon Johnson approximately twenty times, including in the neck and chest. Johnson—who was unarmed—died. In D.C. Superior Court Case 2004 FEL 004000, Wicks was found guilty of Voluntary Manslaughter While Armed after a trial in which he testified. On October 28, 2005, Wicks was sentenced to 200 months' imprisonment.

On June 9, 2020, while under supervision for Voluntary Manslaughter While Armed, Wicks was staying at a girlfriend's house when her ex-boyfriend broke in with a knife. According to the girlfriend, she handed her gun to Wicks who then fired at the ex-boyfriend, hitting him in the arm. The ex-boyfriend fled, and Wicks chased him. Outside, as the ex-boyfriend fled up the street, Wicks traced the ex-boyfriend's movements with the gun before firing at him again.[2] Wicks was arrested but charges were dropped.

## ARGUMENT

Under the Bail Reform Act, if the Court determines that "no condition or combination of conditions will reasonably assure the appearance of [a defendant] as required and the safety of any other person and the community," the Court shall order a defendant held pending trial. 18 U.S.C. § 3142(e). The Act provides, however, for certain crimes, that there is a rebuttable presumption that no conditions or combinations of conditions will assure the safety of the community. *See id.* "For purposes of making that determination, a grand jury indictment, by itself, establishes probable cause to believe that a defendant committed the crime with which he is charged." *United States v. Taylor*, 289 F. Supp. 3d 55, 62–63 (D.D.C. 2018) (internal quotations omitted).

In determining whether any condition or combinations of conditions will assure the safety of the community, in light of any applicable presumptions, the Court weighs four factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release. *See* 18 U.S.C. § 3142(g).

---

[2] The shooting was captured on surveillance video.

In making this determination, the "rules concerning the admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the [detention] hearing." 18 U.S.C. § 3142(f). Specifically, the presentation of hearsay evidence is permitted, and the government may proceed by proffer. *United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996). Moreover, the government is not required to "spell out in precise detail how the government will prove its case at trial, nor specify exactly what sources it will use." *United States v. Martir*, 782 F.2d 1141, 1145 (2d Cir. 1986). *See also United States v. Williams*, 798 F. Supp. 34, 36 (D.D.C. 1992). A pretrial detention hearing should not be used as a discovery device and cross-examination should be limited to the disputed issues. *See Smith*, 79 F.3d at 1210, *see Williams*, 798 F. Supp. at 36.

A review of the 3142(g) factors makes clear that no condition or combinations of conditions will assure the safety of the community if Mr. Wicks were to be released.

**I.      The Nature and Circumstances of this Offense Merits Detention.**

The first factor to be considered, the nature and circumstances of the offense charged, weighs in favor of detention. Mr. Wicks is charged with a serious offense carrying significant penalties. For violating 18 U.S.C. § 922(g), Mr. Wicks faces a maximum sentence of up to fifteen years' imprisonment. Mr. Wicks—now for the fourth time—was found to be in possession of a loaded firearm. And Mr. Wicks did not simply possess this firearm. He used this illegal firearm to terrorize Witness 1, coupling his threats to harm or kill her and her family with the promise that these threats could readily be fulfilled. The Court should take these threats seriously because Mr. Wicks has previously harmed and killed people.

While the defendant is charged with a possessory offense, this Court has warned against discounting the inherent danger associated with loaded firearms. *See United States v. Blackson*, No. 23-CR-25 (BAH), 2023 WL 1778194, at *7-8 (D.D.C. Feb. 6, 2023), *aff'd,* No. 23-3020, 2023 WL 2663034 (D.C. Cir. Mar. 28, 2023) (the absence of evidence of "use" "does little to detract from" the danger posed by a firearm "loaded with 19 rounds of ammunition in an extended magazine, . . . more ammunition than the gun was originally manufactured to carry, thereby increasing its potential to do greater harm" and placement "at the ready, on his person, and easily within reach"). Not only was this firearm loaded, *see United States v. Kent*, 496 F. Supp. 3d 500, 502 (D.D.C. 2020), *aff'd* (Nov. 5, 2020) (finding that a defendant should be detained pretrial in part because "the firearm recovered from the Defendant's person had a round already chambered, making the circumstances even more troubling,") but Mr. Wicks modified this firearm to make it even more deadly. Wicks adapted this handgun to allow it to readily fire more than fifty rounds. By adding a rifle stock and laser sight, he made it easier to fire these fifty rounds both more quickly and accurately. In short, Wicks made a deadlier weapon even more deadly.

As such, the nature and circumstances of this offense weighs heavily in favor of detention.

## II. The Weight of the Evidence Against the Defendant is Formidable.

The second factor to be considered, the weight of the evidence, also weighs in favor of detention.[3]  The Government's case against Defendant Wicks is strong.

---

[3] While some judges in this Court have indicated that this factor should be given less weight, in *United States v. Blackson*, following a thorough review of the text of § 3142 and decisions analyzing this factor, then Chief Judge Howell found that "the weight of the evidence should not automatically be weighed less than the remaining statutory pretrial detention factors." 2023 WL 1778194, at *8. Instead, "the weight of the evidence against [a] defendant [should] be weighed as all factors are—in accordance with the specific facts of this case—to determine whether pretrial detention is appropriate." *Id.* at *10. In an unpublished opinion, the D.C. Circuit affirmed Judge

14

Witness 1 reported that Wicks possessed a unique firearm which she described in detail. She described specific occasions on which Wicks had possessed this unique firearm and provided a photograph to corroborate her account. Law enforcement found this exact firearm and accessories when they executed a search warrant, and Witness 1 even provided a detailed explanation for the firearm's location when the search was conducted. The circumstances of this offense make Witness 1's account more credible. She did not seek out law enforcement after a particularly noteworthy fight with Wicks, but only divulged it during the course of a different investigation. In reporting this she knew she was putting herself and her family at significant risk and did so anyways. And the Government anticipates that its case will only become stronger as its investigation continues.

"[I]f the evidence against a defendant is overwhelming, credible, helpful, and important to the government's case in chief, that may increase the risk that defendant will flee to avoid future court proceedings and may indicate that the defendant is a present danger to himself or the community if the government's allegations later prove to be true." *Blackson*, 2023 WL 1778194, at *10. This is such a case, and Wicks should be detained pretrial.

### III. The Defendant's History and Characteristics Merit Detention.

The third factor, Mr. Wicks' history and characteristics, likewise weighs in favor of detention. Mr. Wicks has killed two people: one with a gun, and one with a knife. He shot and wounded a different person. He assaulted another man, was charged with assaulting another

---

Howell's decision. *United States v. Blackson*, No. 23-3020, 2023 WL 2663034 (D.C. Cir. Mar. 28, 2023). The Second Circuit reached the same decision after a thorough and careful analysis of the issue. *United States v. Zhe Zhang*, 55 F.4th 141, 149-150 (2d Cir. 2022). This Court should follow *Blackson* and *Zhang;* this factor should be given no less weight than any other factor.

woman, and has repeatedly threatened to harm a different woman. "The serious and violent nature of these prior convictions are probative of both defendant's capacity for and willingness to use firearms in a manner that poses a risk to others and the community." *Blackson*, 2023 WL 1778194, at *10.

As indicated by his convictions for unarmed assault and Voluntary Manslaughter While Armed (with a knife), Mr. Wicks does not need firearms to represent a significant danger to this community. Nonetheless, he continues to unlawfully arm himself with deadly weapons, including the modified handgun for which he was charged here. Mr. Wicks has been convicted of one of the most serious crimes possible and yet a lengthy period of incarceration followed by supervision has not deterred him from continuing to acquire guns. Not only has he continued to acquire them: he continues to use them to harm others.

After being convicted of using a sawed-off shotgun to threaten someone, Wicks shot and killed Todd Stradford. After being convicted of carrying the weapon he used to kill Stradford, Wicks threatened his then-girlfriend with a different gun. After being convicted of stabbing a man to death, Wicks used yet another gun to shoot at someone. And after all of those arrests, convictions, period of incarceration, and supervision, Wicks acquired another firearm and used it to threaten Witness 1. Wicks' penchant for violence is particularly startling given the fact that he has been incarcerated for so long which theoretically should have limited his opportunities for additional criminal conduct. *See Blackson*, 2023 WL 1778194, at *10 ("This 17-year period of incarceration, until his release eight months ago, significantly limited his opportunities for additional criminal conduct, leaving that time period as an assessment of his nonviolence inconclusive.")

In sum, this factor overwhelmingly weighs in favor of detention.

**IV.     Mr. Wicks Presents a Danger to Our Community.**

The fourth and final factor, danger to any person or the community posed by Defendant Wicks' release, similarly overwhelmingly weighs in favor of detention.

"At the outset, it cannot be gainsaid that unlawful possession of a firearm that is unregistered and fully loaded, with an extended capacity magazine, carried in a position of easy, quick access poses a significant danger to other persons and the community." *Blackson*, 2023 U.S. Dist. LEXIS 18988, at *33. Defendant Wicks' possession of this firearm alone presented a significant danger to our community. *See United States v. Washington*, 907 F. Supp. 476, 486 (D.D.C. 1995) ("[P]ossession by a felon of a fully loaded semi-automatic pistol suggests that the defendant presents an extreme safety risk to the public.").

But beyond these general concerns, Wicks presents a specific threat to Witness 1. Wicks has repeatedly threatened Witness 1 and her family with harm or death, in some cases using a firearm. He specifically has threatened to retaliate against her should she report him to law enforcement. She has now done that. Since that time, there have been further intimidation efforts, including a report from Witness 1 that Wicks sent men to the home of her mother.

If Wicks were to be released, at best he would return to threatening Witness 1. At worst, Wicks would harm or kill her. And Witness 1's family could also be targeted. Indeed, they already have. Wicks has a lengthy history of using violence to resolve even the slightest disagreement. Here he is facing a significant period of incarceration: there is little doubt that he would resort to the same violence to address this substantial threat to his freedom.

Many defendants who engage in unlawful behavior have the excuse of passion or youth. Not Mr. Wicks. He is almost fifty-years' old. Lengthy periods of incarceration and supervision have done nothing to sate his appetite for possessing firearms and harming people. The Court can be assured that he would continue to do so were he released. As such, he presents an ongoing danger to our community.

## **CONCLUSION**

For all the foregoing reasons, the Government respectfully requests that the Court detain Mr. Wicks pending trial on these charges.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:  */s/ Cameron A. Tepfer*
Cameron A. Tepfer
D.C. Bar No. 1660476
Assistant United States Attorney
601 D Street NW
Washington, D.C. 20530
202-258-3515
Cameron.Tepfer@usdoj.gov